UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **CANDACE JOHNSON**, | Case Number 4:10 CV 499 |
| Plaintiff, | Judge Donald C. Nugent |
| v. | REPORT AND RECOMMENDATION |
| **COMMISSIONER OF SOCIAL SECURITY,** | |
| Defendant. | Magistrate Judge James R. Knepp II |

**Introduction**

Plaintiff Candace Johnson seeks judicial review of Defendant Commissioner of Social Security's decision to deny a period of disability insurance benefits (DIB). The district court has jurisdiction under 42 U.S.C. § 405(g).

This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

**Factual Background**

*Medical Records*[1]

Plaintiff was 42 years old at her alleged onset date, had a high school education and training as a medical secretary. (Tr. 64, 108). She had past relevant work as a medical receptionist. (Tr. 21).

---

[1] Plaintiff only challenges the ALJ's findings regarding her physical restrictions – specifically her headaches. As such, the Court will focus on those records and not summarize her other records.

On May 12, 2005, Plaintiff underwent radiologic testing after complaining of headaches with vertigo and blurred vision. (Tr. 135). A magnetic resonance angiogram (MRA) of the head determined an oval hypointense structure was "suspicious." (Tr. 136).

On May 17, 2005, Plaintiff underwent a CT of her head, which revealed a 10mm unruptured aneurism. (Tr. 152). On July 26, 2005, Plaintiff underwent a pterional craniotomy to clip the aneurism. (Tr. 154). Medical records from Dr. Michael Snitzer show Plaintiff complained of vertigo, poor balance, left eye pain, nausea, and headaches prior to surgery. (Tr. 214-16).

On August 8, 2005, Plaintiff went to the hospital after developing a headache and sudden drainage of cerebrospinal fluid from her nose. (Tr. 159, 161). A CT revealed small ventricles and a moderate amount of pneumocephalus with a partial fracture line at the left frontal sinus near the craniotomy site. (*Id.*). The next day, Plaintiff underwent surgical exploration of her left pterional craniotomy and had the frontal sinus defect repaired. (Tr. 161-62). On August 10, 2005, a CT showed somewhat less prominent bifrontal pneumocephalus and a small amount of epidural air and fluid along the left frontal lobe. (Tr. 164). Notes state that new air fluid level in the left frontal sinus may be related to surgery or cerebrospinal fluid leak. (*Id.*). Plaintiff was discharged on August 15, 2005 with "a decrease in the left eye swelling" and Plaintiff's left ptosis (drooping eyelid) "was resolving secondary to the swelling." (Tr. 159).

Plaintiff saw Dr. Nigel Newman three times in 2005 on referral from her primary care physician, Dr. Snitzer. (Tr. 177). In September, she complained of a drooping upper left eyelid and diplopia (double vision). (*Id.*). Her vision was 20/50 in the left eye and 20/20 in the right. Dr. Newman thought "she had involvement of the superior division of the III cranial nerve and . . . that over time this would improve." (*Id.*). In October, Dr. Newman saw Plaintiff again and noted her

ptosis was "slightly better" but she still had "persistent diplopia." (*Id.*). In December, "there was marked improvement." (*Id.*). She had slight ptosis, but full range of motion with minimal diplopia and her vision was 20/25 on the left side. (*Id.*). Dr. Newman stated: "[S]he has recovered from her III cranial nerve problem." (*Id.*).

On April 18, 2006, state agency physician Paul Morton completed a residual functional capacity assessment. (Tr. 204). He stated Plaintiff could lift 50 pounds occasionally and 25 pounds frequently, sit for about six hours in an eight-hour workday, never climb ladders, ropes or scaffolds, and never work with hazards. (Tr. 205-08).

In April and May 2006, Dr. Robert Burstine evaluated Plaintiff at the request of Dr. Newman to assess the possibility of surgery. (Tr. 259-66). Dr. Newman noted that when he saw Plaintiff on March 14, 2006, "she was still complaining of diplopia in down gaze" and that her ptosis "has gradually improved." (Tr. 265). Dr. Burstine noted double vision with up and down gazes and ptosis of the left eyelid. (Tr. 262, 264).

On August 17, 2006, Dr. Snitzer's office noted that Plaintiff described left eye drainage for one week, neck pain, headaches, and left calf pain. (Tr. 249).

On December 18, 2006, a CT scan showed no evidence of cerebrospinal fluid leaking into the sinus, nasal cavity, or orbits. (Tr. 272). It did show "a small amount of soft tissue density in the left upper ethmoid sinus." (*Id.*).

On December 19, 2006, Plaintiff complained to Dr. Snitzer that her headaches had increased. (Tr. 244). On December 20, 2006, Plaintiff went to the emergency room reporting a two-day headache and increased tearing from her right eye. (Tr. 268). She reported photophobia following the myelogram two days prior. (*Id*). Doctors stated they believed her headache was "related to stress

3

factors in her life" and her final diagnosis was "[h]eadache, not related to CSF leak." (Tr. 269). Doctors prescribed Phenergan and Darvocet. (*Id.*).

On June 25, 2007, Plaintiff's left eye was almost completely closed and there was fluid. (Tr. 237). She also reported a low grade temperature, neck pain, back pain, and dizziness. (*Id.*).

On June 29, 2007, Dr. Snitzer noted Plaintiff had a CT scan of the brain based on neck pain, nausea, and increasing headaches. (Tr. 301). The scan showed probable repair of left posterior communicating artery aneurysm and lacunal infarct within the left thalamus. (*Id.*).

Plaintiff was hospitalized from June 30 to July 1, 2007. (Tr. 303-04). On admission, she complained of vertigo, worsening headaches, nausea, and vomiting. (Tr. 303). She also complained of diplopia on bilateral lateral gaze, upward gaze, and downward gaze. (*Id.*). A neurologist reported Plaintiff's vertigo, gait, nausea, and vomiting were "likely related to a transient viral vestibular neuritis or labryinthitis" and her headaches "were likely a chronic symptomatology and there might be a migrainous component to it." (Tr. 304). Plaintiff was given Darvocet and on the second day, Plaintiff's "symptoms improved greatly." (*Id.*). She was discharged in good condition.

On July 9, 2007, a CT scan of the maxillofacial area showed left maxillary sinus retention cyst or polyp, no evidence of sinusitis, nasal septal deviation, bilateral patency of the osteomeatal complexes, and left-sided craniotomy, and intracranial aneurysmal clipping. (Tr. 300).

On October 29, 2007, Plaintiff reported her headaches were getting worse. (Tr. 234). On January 28, 2008, she reported her headaches were worse, and occuring on a daily basis. (Tr. 232).

On March 4, 2009, Dr. Hazem Samy, a neuro-ophthalmologist, examined Plaintiff because of her diplopia and headaches. She reported daily headaches that are "horrendous" two to three times a week and "[s]ometimes when she gets the bad headaches her left eye will completely close." (Tr.

4

376). She also reported that by the end of the day it feels like her eye is going to pop out of her head. (*Id.*). Dr. Samy noted Plaintiff had monocular double-triple diplopia OS, with no diplopia in her primary gaze, shadowing in her far right and left horizontal gaze, and "triple vision" in her down gaze. (Tr. 371). His impression was "left enophthalmous with vertical diplopia in extreme down and up gaze." (Tr. 375).

Medical records from Dr. Snitzer from September 2005 through May 2008 show Plaintiff was on Coumadin, Zoloft, Luvenox, and Darvocet. (Tr. 217-50). Records also show continuing prescriptions of Darvocet, Coumadin, and Paxil from May 30, 2008 through June 2, 2009. (Tr. 383-92).

*Hearing Testimony*

At the first hearing, Plaintiff testified that she had double vision and blurred vision. (Tr. 406, 408). She disagreed with reports that she had improved and believed that she was leaking cerebrospinal fluid. (Tr. 407-08). She had no restrictions on her driver's license, but limited herself to driving short distances in daylight. (Tr. 408). She could read documents if they were straight in front of her and at a distance. (Tr. 409). She had double vision in her left eye and loss of peripheral vision on the left side. (*Id.*). She stated her right eye was normal, except she was nearsighted. (*Id.*). Plaintiff stated that dizziness sometimes made it difficult for her to walk, particularly on stairs. (Tr. 410). She thought she could probably walk for half a football field on a hard, dry surface. (Tr. 411).

After Plaintiff testified, the ALJ stated: "Counselor, you've got a very credible lady here, but something ain't right with the evidence. I'm going to send her out for examination." (Tr. 411). He then explained:

> Well, all I'm saying here is the record in December of '05 says she's got marked improvement with her contacts, with diplopia and other issues and the cranial nerves.

5

> And no CSF leaking, so something is not correct here because she's so straightforward. I don't see any . . . hist[r]ionics here, I don't see any kind of maker [sic] her case here, so I'm just telling you I'm going to send her out for some kind of examination, I'm not sure which, to see if I can clear up the confusion in the record and your testimony.

(Tr. 411-12). Plaintiff's counsel described difficulty getting medical evidence because Plaintiff had explored a malpractice action. (Tr. 412). The ALJ later told Plaintiff "I'm going to send you out to a physician that we pay for and have you examined" and "So I'm going to send you out for a consult." (Tr. 412-13). He then continued Plaintiff's hearing. (Tr. 413-14).

At the second hearing on April 7, 2009, the ALJ stated he was continuing the hearing because the medical expert who was scheduled to testify could not make it. (Tr. 417).

At the beginning of the third hearing on July 6, 2009, the ALJ explained: "[S]ome records that I saw regarding this leaking after craniotomy w[ere] important to me to pursue because I had two distinct positions and no way to resolve it, so we continued it for a medical expert by the name of Dr. Balk." (Tr. 422A). Dr. Philip Balk testified that he is board certified in internal medicine and rheumatology and had reviewed Plaintiff's records. (Tr. 423-24). He testified that Plaintiff has chronic headache syndrome, but that he was unaware of its origin. (Tr. 424-25). He agreed that there is a migraine quality to it. (Tr. 425). Dr. Balk stated, in response to the ALJ's question, that there was no evidence of continuing cranal fluid leakage. (Tr. 425-26). He cited a January 2007 CT scan, an examination by Dr. Samy, and the fact that "a number of observers have examined the face and head following the second procedure and there is no mention of anyone who has corroborated the findings of cerebral spinal fluid." (Tr. 426).

Dr. Balk also testified Plaintiff had left eye ptosis, a drooping of the eyelid that was repaired surgically. (Tr. 427). She had an impairment in her "up and down gaze" and "at the extreme gazes

6

she develops a double vision when she looks up and when she looks down." (*Id.*). He noted that her visual functions are improved from August 2005, but there is "apparently some residual" from the prior surgery. (*Id.*).

Dr. Balk testified Plaintiff's impairments do not meet listing severity, but she is restricted in looking all the way up and all the way down based on nerve dysfunction. (Tr. 428-29). He noted that the "requirement for frequent Darvocet use that she takes for her headaches" is also a limitation. (Tr. 429). Finally, he noted Plaintiff's description of daily headaches, and occasional "other features such as nausea and significant malaise and difficulty functioning." (*Id.*).

William Lee, a Vocational Expert (VE) also testified. (Tr. 436-42, 445-48). In the hypothetical question, the ALJ asked the VE to assume a person of Plaintiff's age, education, and work experience with:

> a residual functional capacity for light work . . . . This individual must avoid all ladders, ropes and scaffolds, and other than entering the building to go to work and exit work, no stairs, no balancing, must work on a flat surface, flat dry surface. This job cannot involve this individual looking up to do their work or looking down all the time. This individual in those two positions has double vision. This individual is further limited to simple, one, two step routine procedures, with limited and superficial interaction with supervisors, co-workers and the public.

(Tr. 439-40). The VE testified that Plaintiff could perform jobs available in the economy including representative examples: photocopy/business machine operator, light, unskilled housekeeping/cleaners, and library clerks. (Tr. 440). When the ALJ added a restriction of oral instructions only, the VE testified representative jobs existed such as telemarketing, unskilled security guard, or unskilled investigator. (Tr. 441). The VE stated that no jobs existed if Plaintiff missed more than three full days a month. (Tr. 442).

**Procedural Background**

Plaintiff filed an application for DIB on November 9, 2005, alleging disability as of June 10, 2005. (Tr. 64-66). Plaintiff's claim was denied initially and on reconsideration. (Tr 39-41, 44-45). Plaintiff thereafter sought a hearing. An ALJ held three hearings on January 6, 2009, April 7, 2009, and July 6, 2009. (Tr. 402-414; 415-420; 421-450). Plaintiff appeared with her attorney and testified at both the first and third hearings. (Tr. 406-14; 435-36). Dr. Balk and the VE also testified at the third hearing.

In a written decision dated July 23, 2009, the ALJ denied Plaintiff's disability claim. (Tr. 14-23). The ALJ found Plaintiff met the insured status requirements of the Social Security Act through December 30, 2010, had not engaged in substantial gainful activity since her alleged onset date, and had severe impairments of "chronic migraine headache syndrome status post aneurysm and craniotomy; deep vein thrombosis by history with ongoing anti-coagulant therapy; major depressive disorder; and anxiety." (Tr. 16). He then found Plaintiff had

> the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that in addition, the claimant would be prohibited from working with ladders, ropes, or scaffolds; she could not use stairs in the workplace other than those required to enter and exit the building; she must work on a flat, dry surface; she cannot perform work requiring her to look up or look down due to double vision; she is limited to simple one-to-two step routine procedures; and finally, she can tolerate only limited and superficial interaction with supervisors, coworkers, and the public.

(Tr. 18). After determining Plaintiff could not perform her past relevant work as a medical receptionist, the ALJ concluded Plaintiff was not disabled because she could perform a significant number of jobs despite her impairments. (Tr. 21-22). The ALJ's July 23, 2009 decision (Tr. 14-23) became the final decision of the Commissioner following the Appeals Council's denial of review

on January 28, 2010. (Tr. 6-10). *See* 20 C.F.R. § 404.981. Plaintiff then filed the instant case seeking judicial review of the ALJ's decision on March 9, 2010. (Doc. 1).

## Standard of Review

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## Standard for Disability

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. § 423(d). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 – to determine if a claimant is disabled:

9

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## Discussion

Plaintiff raises two objections to the ALJ's decision:

1. The ALJ erred in his assessment of the Plaintiff's complaints of headaches and the impact of Plaintiff's pain on her ability to work.

2. The ALJ erred in failing to order a consultative examination.

(Doc. 15, at 1). For the reasons discussed below, Plaintiff's objections are not well-taken.

**Evaluation of Headaches**

Plaintiff contends the ALJ erred in his analysis of Plaintiff's headaches, specifically in his analysis of Plaintiff's testimony about her pain. Defendant responds that the ALJ's decision is supported by substantial evidence.

It is for the ALJ, not the reviewing court, to judge the credibility of a claimant's statements. *Cruse v. Comm'r of Soc. Sec*, 502 F.3d 532, 542 (6th Cir. 2007) (ALJ's credibility determination accorded "great weight"). If an ALJ rejects a claimant's testimony as not credible, he must clearly state his reasons for doing so. *See Auer v. Sec'y of Health & Human Servs.*, 830 F.2d 594, 595 (6th Cir. 1987). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). In reviewing an ALJ's credibility determination, the Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476. The Court may not "try the case de novo, nor resolve conflicts in evidence". *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

The Sixth Circuit recognizes that pain alone may be disabling. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). However, an ALJ is not required to accept a claimant's own testimony regarding her pain. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The regulations establish a two-step process for evaluating pain. *See* 20 C.F.R. § 404.1529; *see also* Social Security Ruling (SSR) 96-7p, 1996 WL 374186. In order for pain or other subjective complaints to be considered disabling, there must be: 1) objective medical evidence of an underlying medical condition; and 2) objective medical evidence that confirms the severity of the alleged

11

disabling pain, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *Felisky v. Bowen*, 35 F.3d 1027, 1038 (6th Cir. 1994). The ALJ is to consider certain factors in determining whether a claimant has disabling pain: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication to relieve pain; and 6) any measures used to relieve pain. 20 C.F.R. 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40.

In making his RFC determination and analyzing Plaintiff's credibility, the ALJ acknowledged the requirement that he consider pain under SSR 96-7p and 20 C.F.R. § 404.1529. (Tr. 19). The ALJ specifically set forth his reasons for partially discounting Plaintiff's claims of disabling pain. (Tr. 19). He found that Plaintiff's "statements concerning the intensity, persistence and limiting effect of [her] symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment", specifically:

> The subjective factors in this case are generally, but not entirely, persuasive (SSR 96-7p and 20 CFR 404.1529 and [4]16.929]). The claimant's activities of daily living are not completely restricted. Although the activities take longer, she remains independent in self-care, does light household chores, small meal preparation, and light grocery orders. She attends church and occasional sporting events for her daughter. Since undergoing the surgical procedures related to her aneurysm and subsequent sinus fracture, the claimant's course of treatment has been generally conservative.

(*Id.* (internal citations omitted)).

The ALJ's statement that Plaintiff's daily activities "are not completely restricted" is supported by substantial evidence. Plaintiff herself reported she cooks and does light cleaning. (Tr. 76). She also reported she does light grocery shopping, and laundry if someone carries the basket for her. (Tr. 78). Plaintiff reported spending time sitting and talking with others once or twice a

12

week. (Tr. 79). Finally, she reported going to church "every Sunday if able" and to her daughter's sports events "depending on how I feel." (*Id.*).

Additionally, the ALJ's statement that Plaintiff's treatment was conservative is supported by substantial evidence. Later in his decision, the ALJ explained:

> The claimant's migraine pain has not resulted in frequent emergency or inpatient treatment. Her physical examination indicates entirely normal strength, sensation, reflexes, and gait. Her visual examinations show double vision only at the extreme of up and down gaze, and not peripherally. The medical expert testified that the infarct visualized on head CT is not in a location in the brain associated with any motor or balance deficit. Further, CT scan with contrast indicates that there is no ongoing leakage of cerebrospinal fluid.

(Tr. 20).

Plaintiff had surgery in July and August 2005 to clip her brain aneurism and to repair a frontal sinus defect. (Tr. 154, 159, 161). Since that time, Plaintiff's treatment has consisted mostly of prescription medication. (*See* Tr. 217-50, 383-92). Plaintiff went to the emergency room on December 20, 2006, but was diagnosed with "[h]eadache, not related to CSF leak" and prescribed Phenergan and Darvocet. (Tr. 269). The CT scan in December 2006 showed no evidence of cerebrospinal fluid leakage. (Tr. 272). Later CT scans in June and July of 2007 did not show any problems aside from a left maxillary sinus retention cyst of polyp, and a lacunar infarct that the medical expert testified the infarct did not affect Plaintiff's gait. (Tr. 300-01, 433). Plaintiff was hospitalized from June 30 to July 1, 2007 due to headaches and other symptoms. (Tr. 303-04). A neurologist reported that her non-headache pain was "likely related to a transient viral vestibular neuritis or labryinthitis" (Tr. 304). Plaintiff was given Darvocet after Tylenol did not control her headaches, and "[o]n the second day, [her] symptoms improved greatly." (*Id.*). Although Plaintiff continued to report headaches, medical records from Plaintiff's treating physician show primarily

13

continued prescriptions of Darvocet and Paxil. (Tr. 383-92). *See, e.g.*, *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 335 (6th Cir. 2007) (noting claimant's "modest treatment regimen . . . is inconsistent with a diagnosis of total disability").

Plaintiff also contends the ALJ failed to consider: "the frequency, duration and intensity of the pain, and the pain medications prescribed". (Doc. 15, at 12). However, the ALJ noted Plaintiff's complaints of "daily headaches" and that she "indicate[d] that she must lie down during the day from between ten minutes to several hours depending on the severity." (Tr. 18-19). The ALJ also noted Plaintiff was on narcotic pain relievers, and that she "is treated for the headache pain with the medication Darvocet, and she reports some relief." (Tr. 19-20). Although Plaintiff argues the ALJ failed to consider Dr. Balk's statement that there would be limitations resulting from Plaintiff's use of Darvocet (Tr. 429), Dr. Balk did not opine that Plaintiff had any restriction preventing work. (Tr. 428-29). Contrary to Plaintiff's suggestion, the ALJ properly considered the required factors in evaluating her subjective complaints of pain. 20 C.F.R. 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40.

Plaintiff argues that "[s]ubstantial medical and testimonial evidence proves that Ms. Johnson suffers from severe, chronic headaches which require significant medication and which would result in her missing work more than three days a month." (Doc. 15, at 13-14). However, even if substantial evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Here, as discussed above, the ALJ properly evaluated the factors required by the regulations in evaluating

Plaintiff's credibility and claims of disabling pain. (Tr. 20). His "explanations for partially discrediting [Plaintiff's testimony] are reasonable." *Jones*, 336 F.3d at 476.[2]

**Consultative Examination**

Plaintiff secondly argues the ALJ erred in failing to order a consultative examination after he stated he would. She contends the ALJ failed in his duty to develop the record, particularly in light of his reference to a consultative examination and allegations that Plaintiff's medical records were incomplete. Defendant responds: "[I]f the ALJ's understanding of the medical evidence is the reason for obtaining a medical opinion, then the ALJ is the person best situated to determine the type of assistance that would provide him the clearest understanding." (Doc. 18, at 11).

Plaintiff is correct that an ALJ has a duty to develop the record because of the non-adversarial nature of Social Security benefits proceedings. *See Heckler v. Campbell*, 461 U.S. 458, 470 (1983). The Sixth Circuit has emphasized that this duty is particularly important when a claimant is acting *pro se*. *See Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983); *cf. Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009) (rejecting claimant's argument under *Lashley* that ALJ failed to develop the record by noting: "*Lashley* concerned an ALJ's duty in the case of a *pro se* claimant . . . whereas [claimant] was represented by counsel at the hearing. [Claimant] has made no showing that she was unable for any reason to present her case."). The duty to develop the record, however, is balanced with the fact that "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable

---

[2] This is so even though the ALJ stated at the initial hearing that Plaintiff was credible. (Tr. 411). After receiving more evidence in the form of Dr. Balk's testimony, the ALJ concluded Plaintiff's subjective complaints were not fully credible. (Tr. 19). The ALJ was entitled to change his mind after he had all the evidence.

15

the Secretary to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. §§ 416.912, 416.913(d)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) (explaining claimant's burden to prove disability).

> As the Sixth Circuit pointed out in *Landsaw* regarding consultative examinations:
>
> Moreover . . . the regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination. 20 C.F.R. § 416.917(a).
>
> As to the ALJ's duty to conduct a "full inquiry," 20 C.F.R. § 416.1444, we adopt the following statement by the Fifth Circuit which applies equally to the present case and disposes of plaintiff's argument:
>
>> "[F]ull inquiry" does not require a consultative examination at government expense unless the record establishes that such an examination is *necessary* to enable the administrative law judge to make the disability decision. In appellant's case, the evidence in the record upon which the administrative law judge based his denial of benefits fully developed the facts necessary to make that determination. The [evidence] supports the conclusion that appellant is not disabled....

803 F.2d at 214 (quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977) (emphasis in original)). Additionally, the regulations give an ALJ discretion to determine whether to consult a medical expert. 20 C.F.R. § 404.1527(f)(2)(iii) (ALJ "may . . . ask for and consider opinions from medical experts on the nature and severity of [a claimant's] impairment§").

Here, although the ALJ did explicitly state he planned to order a consultative examination (Tr. 411-14), he ultimately decided to call a medical expert. At the first hearing, the ALJ expressed confusion about the conflict between Plaintiff's testimony and the medical record. (Tr. 411-14). He was within his discretion to resolve that confusion by consulting a medical expert, rather than

16

ordering a consultative examination.³ Although it would have been helpful for the ALJ to explain to Plaintiff his reasons for ultimately making this decision, there is no requirement in the regulations that he do so.

Finally, as Defendant points out, although Plaintiff argues her medical records were incomplete, she points to no specific error attributable to the missing evidence. It is ultimately Plaintiff's burden to provide evidence sufficient for the ALJ to make a disability determination. *Landsaw*, 803 F.2d at 214, *Her*, 203 F.3d at 391. The ALJ's decision to consult a medical expert rather than order a consultative examination was not contrary to law and the ALJ did not fail in his duty to develop the record.

**Conclusion and Recommendation**

Following review of the arguments presented, the record, and applicable law, this Court finds the Commissioner's decision denying DIB supported by substantial evidence and not contrary to law. As such, the Court recommends the Commissioner's decision be affirmed.

                                                            s/James R. Knepp II
                                            United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

---

³ Plaintiff, who was represented by counsel, never mentioned the ALJ's failure to order a consultative examination at either of the two subsequent hearings, or in her argument to the Appeals Council. (Tr. 399-401).